**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| STEVEN FRISCHLING,<br><br>    *Plaintiff*,<br><br>    v.<br><br>DAVID RADFORD II, ALBERT GOSSELIN III, & TOWN OF MONTVILLE,<br><br>    *Defendants*. | No. 3:24cv198 (MPS) |

## <u>RULING ON MOTIONS FOR SUMMARY JUDGMENT</u>

Steven Frischling brings this action under 42 U.S.C. § 1983 against Montville police officer David Radford, Connecticut State Police Sergeant Albert Gosselin, and the Town of Montville challenging his March 9, 2021 arrest. The complaint alleges federal and state claims of false arrest and malicious prosecution, intentional and negligent infliction of emotional distress, and negligence as to Radford; a failure to intervene claim as to Gosselin, and a claim under Conn. Gen. Stat. § 52-557n as to the Town of Montville.[1] First Am. Compl., ECF No. 38. Radford, Gosselin, and the Town each have filed a motion for summary judgment as to the counts against them, ECF Nos. 71, 74, 76. Frischling has filed a partial motion for summary judgment as to his federal claim of malicious prosecution against Radford (count 3) and Radford's affirmative defense of qualified immunity, ECF No. 72. As I explain further below, because no reported court decisions have construed the statute under which Radford arrested Frischling and because reasonable police officers could disagree as to whether there was probable cause, Radford is entitled to qualified immunity. So Radford's motion for summary judgment is granted as to the federal claims of false arrest and malicious prosecution under the Fourth Amendment, Gosselin's motion is granted

---

[1] Frischling indicates in his papers that he is withdrawing the abuse of process (count 6) and Conn. Gen. Stat. § 52-571k (count 11) claims as to Radford, ECF No. 80 at 2 n.1, and the state law false arrest claim (count 4) as to Gosselin. See ECF No. 82 at 1. Therefore, those claims are dismissed.

because the failure to intervene claim is predicated on the Fourth Amendment claims, and Frischling's motion is denied. I decline to exercise supplemental jurisdiction over Frischling's state law claims and dismiss those claims without prejudice; accordingly, I deny the Town of Montville's motion as moot.

## I.    FACTUAL BACKGROUND

The following facts are taken from the parties' Local Rule 56(a) Statements and the attached exhibits and are undisputed unless otherwise stated.

At the time of the incident at issue, Frischling was a member of the Chesterfield Fire Company ("CFC"), a volunteer fire department serving the town of Montville, Connecticut. Am. Compl, ECF No. 38 ¶ 7. In December 2019, the CFC authorized the creation of a Public Information Officer ("PIO") position. ECF No. 83-1 ¶ 3. Frischling has served as the CFC PIO since that time. *Id.* ¶ 4. Prior to January 1, 2021, the CFC approved a set of written duties and responsibilities of the CFC PIO. *Id.* ¶ 6. Frischling drafted the CFC PIO written duties and responsibilities with Keith Truex, the Chief of the CFC. ECF No. 80-1 ¶ 10. The document states that the PIO officer is responsible for developing, coordinating, and directing public relations activities for the CFC. ECF No. 74-11. According to the document, the PIO's duties include "research[ing], writ[ing], and design[ing] internal and external communications such as press releases and external reports for the public and/or agency"; "[p]hotograph[ing] and visually document[ing] incident scenes for release to the public, as well as usage for recruiting, training, and archives"; and "[m]anag[ing] and creat[ing] content for the agency's social networking sites and department website." *Id.* ¶¶ 4, 5, 10. The document stated that "[a]ll images must meet or exceed HIPAA photographic guidelines for release and further dissemination." *Id.* ¶ 5. Chief

Truex authorized the creation of an official Facebook page for the CFC PIO ("CFC PIO Facebook Page"). ECF No. 83-1 ¶ 5.

Defendant Radford was a Lieutenant in the Montville Police Department. ECF No. 83-1 ¶ 8. As early as November 2020, Radford knew that Frischling was the CFC PIO. *Id.* ¶ 10.

*Radford's Email about Frischling*

On November 20, 2020, Radford emailed the Town of Montville Public Safety Commission regarding a November 6, 2020 Facebook post by Frischling as the CFC PIO. ECF No. 80-1 ¶ 65. The post advertised the Montville Police Department's Fill-A-Cruiser Event scheduled for November 7 and 8. ECF No. 74-27 at 3. It included a photograph of a patrol vehicle with the Montville Police Department logo and a dog wearing a police hat. ECF No. 80-1 ¶ 66; ECF No. 74-27 at 3. Radford stated in his email to the Public Safety Commission that the post depicted the Montville Police logo and the dog in a manner that misrepresented the police department because Frischling did not get consent from the department to post its logo. ECF No. 74-27 at 2. As to the picture of the dog, Radford stated that "I believe this picture was purposely chosen to mock one of my officers. There was an investigation that was recently closed involving the Chesterfield PIO and my officer. This is clearly a retaliatory act against my officer, as a result of the investigation that took place." *Id.* Radford further stated that "I am sending this email to all of you so that something will hopefully be done with the Chesterfield PIO acting as a Town agent, with many functions.…He represents the Chesterfield Fire Company, but does not … represent the Montville Police Department in any way." *Id.*

*The Photos Taken at the Accident Scene*

On the morning of February 7, 2021, a motor vehicle accident occurred in Montville. ECF No. 83-1 ¶ 11. There was a collision between two vehicles. ECF No. 74-12. Members of the

CFC, including Chief Truex, and police officers from the Montville Police department, responded to the scene. ECF No. 83-1 ¶ 13. Frischling also arrived at the scene. He wore a high-visibility jacket with the words "Chesterfield Fire PIO" emblazoned on the back and was equipped with two cameras for taking photographs. *Id.* ¶ 14. As the CFC PIO, Frischling took several photographs of the accident, two of which are at issue. *Id.* ¶ 15. The first photograph shows firefighters using an extrication tool on a vehicle, a 2006 Toyota Camry, that was involved in the accident. *Id.* ("Extrication Photograph"); ECF No. 80-1 ¶ 17; ECF No. 74-13 (Photo). There appears to be a person in the car but the face is pixelated, ECF No. 74-13.[2] The parties agree that Lawrence Haney, the driver of the Camry, was inside the vehicle at the time the Extrication Photograph was taken, ECF No. 80-1 ¶ 14, but dispute whether the photo depicts Lawrence Haney. *Id.* ¶¶ 14, 17. Frischling seems to suggest that the head belongs to a firefighter who entered the vehicle to assist and who covered the driver with a sheet. ECF No. 74-9, Frischling Dep. at 8, 18.

The second photograph at issue is set some distance away and depicts a firefighter leaning over a stretcher next to a vehicle involved in the accident, a police officer standing in front of the stretcher, and a male standing to the left of the stretcher. ("Stretcher Photograph"). ECF No. 74-14 (photo). The stretcher is largely obscured, including where the individual's head and face would be, except for a portion showing a white sheet and restraint straps. *Id.*

*The Facebook Post*

Later in the day on February 7, 2021, Frischling posted to the CFC PIO Facebook Page a narrative concerning the accident and four photographs from the accident, including the

---

[2] Frischling's Local Rule 56(a)(2) Statement disputes that the photo depicts an individual in the car, ECF No. 80-1 at ¶ 17. But in his deposition, Frischling testified "[t]here is a person under a blanket … and a head, while pixilated [sic], that is not of a victim …." ECF No. 74-9 at 6.

Extrication Photograph and the Stretcher Photograph.  ECF No. 83-1 ¶ 16.  The photos were posted with the following statement:

> This morning, shortly after 9:15AM, as the snow began to fall over the region, your Chesterfield Fire Company and Oakdale Fire Department, along with a Montville Career Firefighter and East Lyme's Flanders Fire Department, operated on the scene of a two car motor vehicle accident, with entrapment, on Route 85 at Grassy Hill Road, Sunday, February 7, 2021, in Oakdale, Montville, CT.
>
> The motor vehicle accident resulted in Route 85 being closed to traffic for more than half an hour, and three patients being transported to the hospital by the Chesterfield Fire Company, Oakdale Fire Department and Flanders Fire Department, along with an L&M Hospital Paramedic.
>
> Your Montville Volunteer Fire Companies depend on you, our neighbors, to help protect our community. You are on this planet to make a difference, to do something. Leave a legacy. Join your local Montville Volunteer Fire Company.
>
> (Images may have a digital blur to obscure portions of a patient's identity and their license plate).

ECF No. 74-15.

*The Investigation*

After Frischling made the post, one or more persons in the Montville Police Department building brought the post to Radford's attention.  ECF No. 83-1 ¶ 17.  Thereafter, Radford commenced an investigation into whether Frischling violated Conn. Gen. Stat. § 53-341c.  *Id.* ¶ 18.  Section 53-341c is titled "Unauthorized taking or transmission by first responders of images of crime or accident victims" and provides:

> Any … firefighter, as [that term is] defined in section 53a-3[3], … who responds to a request to provide medical or other assistance to a person and, other than in the performance of his or her duties, knowingly (1) takes a photographic or digital image of such person without the consent of such person or a member of such person's immediate family; or (2) transmits, disseminates or otherwise makes available to a third person a photographic or digital image of such person without the consent of such person or a member of such person's immediate family, shall

---

[3] Section 53a-3 defines "Firefighter" as "any agent of a municipality whose duty it is to protect life and property therein as a member of a duly constituted fire department whether professional or volunteer."

be fined not more than two thousand dollars or imprisoned not more than one year, or both.

Radford had not been involved in a case involving this statute before. ECF No. 80-1 ¶ 20. He went to Lawrence Haney's residence "to see if the social media post had been approved to be posted." ECF No. 74-10, Radford Dep. at 12. Lawrence Haney was not at home. *Id.* at 13. Radford spoke with Haney's daughter, Jeanne Getty, to inquire if Mr. Haney or the family had approved Frischling's Facebook post depicting the accident. ECF No. 80-1 ¶ 21. Ms. Getty indicated that she was her father's power of attorney and that the family would not have given permission to have their information posted. *Id.* Radford did not show her the Extrication Photograph. ECF No. 83-1 ¶ 19. Jeanne Getty provided a sworn statement to Radford stating that Mr. Haney did not give anyone permission to post his picture on Facebook or social media and that no one involved in the crash had known that the crash scene was posted on Facebook. ECF No. 80-1 ¶ 22.

Radford attempted to contact the other driver involved in the accident before drafting the arrest warrant but does not recall making contact. *Id.* ¶ 24.

On March 5, 2021, Radford and another officer met with Frischling and Chief Truex about the accident and the Facebook Post. *Id.* ¶ 25. This was the first time Radford and Frischling had ever spoken in person. *Id.* ¶ 27. Radford asked Frischling whether he had obtained permission from the crash victims before posting pictures online. ECF No. 74-17. Frischling responded that any faces were pixelated per departmental policy. *Id.* Chief Truex provided Radford with a copy of the CFC PIO duties and told him that Frischling was performing his duties as CFC PIO when he took and posted the four photographs. ECF No. 83-1 ¶ 20. After the meeting, Frischling sent Radford an email bringing his attention to the "other than in the performance of his or her duties" language of Conn. Gen. Stat. § 53-341c. *Id.* ¶ 21.

6

*Arrest Warrant*

On March 8, 2021, Radford applied for an arrest warrant to arrest Frischling on two counts

of violating Conn. Gen. Stat. § 53-341c.  ECF No. 74-4.  These counts related to the dissemination

of the Extrication Photograph and the Stretcher Photograph via the Facebook post.  ECF No. 80-1

¶ 35.

In pertinent part the warrant application states:

2) That, on 02/07/21 at 0916 hours there was a motor vehicle accident at the intersection of Route 85 and Grassy Hill Road, in the Oakdale section of Montville. The fire departments were started due to the reports of injuries. While the different fire department personnel were on scene, it was determined that the driver of a Gray 2006 Toyota Camry needed to be extricated from the vehicle. This entailed using an extricating tool to force the driver's door open, to treat and transport the operator/ victim.

3) That, it was brought to my attention that later that day (02/07/21) the Chesterfield Fire Co. PIO, Steven Frischling (the accused), posted on Facebook a narrative and photos of the crash. The accused is an active first responder with the Chesterfield Fire Co., located at 1606 Hartford New London Tpke, Oakdale, CT. The accused identifies himself as the Chesterfield PIO and responds to scenes as a first responder to take pictures of the scene and post them on social media platforms; specifically, Facebook. The accused will also identify as fire police and occasionally direct traffic at a scene.

4) That, the accused's post had a narrative of the incident and included several pictures of the scene. The pictures of the scene included occupants of the vehicles and in one particular picture, the victim was still in the vehicle being extricated. This picture showed fire personnel using the tool to open the victim's door and it depicted the victim still in the car. A second photo also depicted a male standing next to an individual being strapped onto a stretcher for transport. This picture only depicts a silhouette of the body of the individual under a blanket on the stretcher. After posting the narrative and pictures, the accused then put in parenthesis "Images may have a digital blur to obscure portions of a patient's identity and their license plate". Addressing that he posted the victim's photos without consent.

5) That on 03/03/21 I contacted and met with the witness and obtained a signed sworn statement regarding the victim's crash.  The witness is a Power of Attorney for the victim and states that the victim was still in a rehab facility.  The witness also stated that the victim would not want his information posted on social media. The witness stated that the victim did not give anyone permission to post his picture on Facebook or any other social media….

7

ECF No. 74-4.

The warrant application further stated that Radford had met with Frischling and Chief Truex and that Radford

> asked the accused when he takes scene photos, specifically crash scene ones, does he obtain permission from victims in vehicles to post them on social media platforms. The accused stated that for one, permission in the right of the public view is not required and any face is blurred. I then asked the accused if that was a yes or no answer to my question. The accused then stated, 'There is no requirement to obtain any permission from any victim in the right of the public view in any photo as per policy, the faces are pix[e]lated.' 'They are unidentifiable.'

ECF No. 74-4 ¶ 7. Radford then "asked the accused what he meant by 'As per policy.' [Frischling] stated that they have an internal policy that anything that would directly show a victim's face would be blurred or typically pix[e]lated." *Id.* ¶ 9. Radford further averred that he reviewed the police video of the incident and "confirmed that the accused was on the scene as both a first responder and the PIO. The accused was clearly wearing a high visibility jacket with Chesterfield Fire Company on the back." *Id.* ¶ 10.

Radford presented the arrest warrant application to Officer Albert Gosselin, the acting Resident State Trooper in the Town of Montville. ECF No. 80-1 ¶¶ 3, 36. Officer Gosselin signed the jurat.[4] ECF No. 74-4 at 4. Gosselin was not involved in the underlying investigation. ECF No. 80-1 ¶ 38.

On March 8, 2021, Assistant State's Attorney Sarah Bowman reviewed and signed the arrest warrant. ECF No. 80-1 ¶ 40. This was the first case she had involving § 53-341c. *Id.* ¶ 41. On March 9, 2021, a Connecticut Superior Court judge signed the arrest warrant. *Id.* ¶ 49. Frischling was arrested later that day. *Id.* ¶ 50.

---

[4] "'Jurat' means a notarial act in which a notary public certifies that a signatory, whose identity is personally known to the notary public or proven on the basis of satisfactory evidence, has made, in the notary public's presence, a voluntary signature and taken an oath or affirmation vouching for the truthfulness of the signed document." Conn. Gen. Stat. § 3–94a(3).

*Frischling Points to an Alleged Violation*

Thereafter, on March 10, 2021, Frischling contacted Gosselin regarding photographs posted on the Montville Fire Fighters Association IAFF Local 3386 Facebook page that Frischling felt violated Conn. Gen. Stat. § 53-341c. ECF No. 80-1 ¶ 51. Officer Noyes of the Montville Police Department interviewed the parties depicted in the photographs. *Id.* ¶ 52. According to her report, she closed the investigation "due to a lack of probable cause and having no complaint from the involved parties." ECF No. 74-21 at 11.

On July 14, 2022, Radford met with Lawrence Haney's daughter, Jeanne Getty, and her husband, Douglas. ECF No. 80-1 ¶ 54. The Gettys told Radford that they were able to identify the vehicle in the Extrication Photo as Lawrence Haney's vehicle. *Id.* They further stated that they could identify Lawrence Haney sitting in the driver's seat. *Id.* Douglas Getty provided a written statement that his father-in-law was involved in the accident and did not give his permission for photos to be published. ECF No. 74-22.

In March 2023, the charges were dismissed. ECF No. 80-1 ¶ 64. This action followed.

## II.    LEGAL STANDARD

"Summary judgment is appropriate where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). "A genuine dispute of material fact exists for summary judgment purposes where the

9

evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan*, 737 F.3d at 843. If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## III.    DISCUSSION

### A.    False Arrest and Malicious Prosecution Claims under § 1983

Frischling alleges that Radford arrested and prosecuted him without probable cause in violation of the Fourth Amendment. ECF No. 38, Am. Compl., counts 1 and 3. Specifically, he alleges that Radford made false and misleading statements and omitted material information from the warrant application critical to a finding of probable cause. ECF No. 38 ¶¶ 22, 23. Radford moves for summary judgment on the grounds that even if the affidavit was corrected to eliminate the allegedly false and misleading statements and to include the allegedly omitted information, there would be probable cause, and even if not, he nonetheless is entitled to qualified immunity. ECF No. 74. Frischling opposes the motion, ECF No. 80, and in turn moves for summary judgment on the malicious prosecution claim and Radford's qualified immunity defense. ECF No. 72.

"The existence of probable cause is a complete defense to claims of false arrest and malicious prosecution." *Jimenez v. Bogle*, No. 24-323, 2025 WL 883211, at *1 (2d Cir. Mar. 21, 2025). "Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). "[P]robable cause is a fluid concept ... not readily, or even usefully, reduced to a neat set of legal

10

rules.... While probable cause requires more than a mere suspicion of wrongdoing, ... its focus is on probabilities, not hard certainties.... In assessing probabilities, a judicial officer must look to the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (internal quotation marks and citations omitted). "In evaluating whether probable cause exists, the court must look at the 'totality of the circumstances'" and "must base its assessment on objective facts and not an officer's subjective intent." *Friend v. Gasparino*, 743 F. Supp. 3d 415, 428 (D. Conn. 2024) (citations omitted).

Here, Frischling was arrested pursuant to a warrant signed by a Connecticut judge, creating a presumption that his arrest was supported by probable cause. *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).  But as stated above, Frischling argues that the affidavit submitted by Radford in support of the arrest warrant contained false statements and material omissions that, if corrected, would vitiate probable cause.

"In so arguing, a plaintiff must show that the officer knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, and that such false or omitted information was necessary to the finding of probable cause." *Kaskel v. Compagnone*, 664 F. App'x 109, 110 (2d Cir. 2016) (summary order) (internal quotation marks and citation omitted).  To evaluate such a claim, the Court "put[s] aside allegedly false material, suppl[ies] any omitted information, and then determin[es] whether the contents of the 'corrected affidavit' would have supported a finding of probable cause." *Id.* at 110–111.  To correct the affidavit, the Court must "examine all of the information the officers possessed when they applied for the arrest warrant." *Escalera*, 361 F.3d at 744.

11

*Omitted Information*

A firefighter violates § 53-341c if he "responds to a request to provide medical or other assistance to a person and, other than in the performance of his or her duties, knowingly … transmits, disseminates or otherwise makes available to a third person a photographic or digital image of such person without the consent of such person or a member of such person's immediate family."

Frischling first argues that Radford omitted information as to whether Frischling's dissemination of an image was done "other than in the performance of" his duties. Specifically, Frischling asserts that Radford omitted, among other things, (1) information as to Frischling's duties as a PIO, even though Radford was aware that the duties of the CFC PIO included photographing incident scenes for release to the public and creating content for the agency's social networking sites because Chief Truex had provided him with a written description of those duties; (2) Chief Truex's statement that Frischling was performing his duties as the CFC PIO when he took and posted the photographs; (3) that Frischling made the post to the CFC PIO Facebook page rather than a personal Facebook page; (4) a description of the narrative Frischling posted; and (5) that Frischling's jacket, worn at the accident scene, was emblazoned with the acronym "PIO." ECF No. 83-1 ¶ 23.

Frischling also argues that Radford omitted information bearing on whether the Extrication and Stretcher Photographs contained images "of a person" for whom "medical or other assistance" was requested. Frischling argues that Radford made misrepresentations that suggested that the photos depicted identifiable victims of the accident. He points to the statements in the warrant affidavit that the "pictures of the scene included occupants of the vehicles" and that "the victim was still in the vehicle being extricated," which implied that the photo depicted an identifiable

12

victim when only a portion of a person's head is visible and that image is pixelated. ECF No. 72-1 at 20; ECF No. 72-24. Frischling also argues that Radford omitted that no person had identified the victim in the Extrication Photograph before he prepared the warrant application. ECF No. 72-1 at 17.

As to the Stretcher Photograph, Frischling points to (1) the statement that the photo "depicted a silhouette of the body of the individual under a blanket", which, Frischling contends, suggests that the photo depicted a dead victim, and (2) the statement that the picture shows a "male standing next to an individual being strapped onto a stretcher for transport" when the view of the individual on the stretcher, including that individual's head and face, was largely obstructed by the firefighter and officer positioned in front. ECF Nos. 72-24 at 3; 72-1 at 18. Frischling also asserts that Radford omitted that someone "in the building" of the Montville police department "brought the FB post" to his attention, which was needed to clarify that a victim was not the individual who brought the post to Radford's attention.

Frischling argues that, thus corrected, the affidavit (1) contains no evidence that he was *not* performing his duties when he disseminated the photo and (2) negates probable cause to believe that the photographs depicted a "person" for whom "medical or other assistance" was requested. Radford disagrees and contends that there is probable cause because regardless of Frischling's PIO duties, posting on Facebook photos containing images of victims without consent violates the statute, the intent of which is to protect privacy. ECF No. 72-20, Radford Dep. at 67, 74-75, 86. I need not and do not resolve the parties' dispute about whether there was actual probable cause to arrest Frischling for violating § 53-341c under the corrected affidavit because even if there was not, Radford is entitled to qualified immunity.

**Qualified Immunity**

"Even where actual probable cause does not exist, police officers may be entitled to qualified immunity from a § 1983 false arrest claim if their actions did not violate 'clearly established' rights or if 'arguable probable cause' existed at the time of the arrest." *Guan v. City of New York*, 37 F.4th 797, 806 (2d Cir. 2022).

*Clearly Established*

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks and citations omitted). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Id.* "In the case of an arrest without probable cause, the requirement of specificity means that the law defining what constitutes probable cause for the charged crime must also be clear." *Haidon v. Danaher*, No. 3:19-CV-119 (SRU), 2024 WL 3982880, at *10 (D. Conn. Aug. 29, 2024). The Supreme Court explains:

> We have stressed that the specificity of the rule [prohibiting the officer's conduct in the particular circumstances before him] is especially important in the Fourth Amendment context….Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in the precise situation encountered…. Thus, we have stressed the need to identify a case where an officer acting under similar circumstances … was held to have violated the Fourth Amendment…. While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular arrest beyond debate.

*Wesby*, 583 U.S. at 64 (internal quotation marks and citations omitted). "Only if the specific contours of the probable cause standard are well-defined can it be 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Haidon*, 2024 WL 3982880, at *10 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

14

Radford argues that the law was not clearly established that his conduct was unlawful because the legal standard governing probable cause for the crime of § 53-341c is unsettled. Neither party offers any caselaw interpreting § 53-341c, which was enacted in 2011, and the Court's research reveals none. There is, then, no "case where an officer acting under similar circumstances … was held to have violated the Fourth Amendment." *Wesby*, 583 U.S. at 64. Indeed, because the statute is still untested, there is no case "where an officer [was] acting under similar circumstances" at all. Courts commonly grant qualified immunity in these situations, especially when the alleged constitutional violation turns on an unsettled question of state law. *See Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 59-63 (2d Cir. 2003)(where Fourth Amendment unlawful entry claimed depended on unsettled question of state law concerning authority of conservators, the plaintiff could not demonstrate the violation of a clearly established right of which a reasonable officer would have known and the officers were entitled to qualified immunity); *Leise v. Christie*, 2025 WL 2462457, at *5 (2d Cir. Aug. 27, 2025)("In light of the ambiguity under Vermont law about whether an investigative report is confidential, it was reasonable for Christie and Yang to have believed that releasing the Investigative Report was lawful. Because Leise bases his substantive due process claim on the alleged violation of Vermont law, he cannot show that Christie and Yang violated a clearly established federal constitutional right*.")*; *Local 851 of Int'l Bhd. of Teamsters v. Thyssen Haniel Logistics, Inc.*, 2004 WL 2269703, at *10 (E.D.N.Y. Sept. 30, 2004) (dismissing due process claims on qualified immunity grounds where "New York law was unresolved as to whether Local 851 had a property interest in the forfeited funds as a 'victim' under [CPLR] Article 13-A.").

Frischling points to language in *Hope v. Pelzer*, 536 U.S. 730 (2002), which held that "officials can still be on notice that their conduct violates established law even in novel factual

15

circumstances," that "general statements of the law are not inherently incapable of giving fair and clear warning," and that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." ECF No. 80 at 15-16 (quoting *Hope*, 536 U.S. at 740-41). More recently, however, in *Wesby*, the Court stated that qualified immunity cases not requiring a precedent involving similar circumstances would be "rare": "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances…. But a body of relevant case law is usually necessary to clearly establish the answer with respect to probable cause." 583 U.S. at 64 (citation omitted).

This is not the "rare" case in which any constitutional violation would have been "obvious" to the arresting officer. Such cases generally involve egregious facts in which it would be apparent to any reasonable official that he was violating the law. *Hope* itself was an Eighth Amendment case in which corrections officials allegedly chained an inmate to a hitching post in the sun for seven hours with only one or two water breaks and no bathroom breaks. 536 U.S. at 737. Fourth Amendment cases in this Circuit invoking the *Hope* exception likewise feature blatant or shocking scenarios. *See, e.g., Simon v. City of New York*, 893 F.3d 83 (2d Cir. 2018)(denying qualified immunity where officers with material witness warrant that authorized them to take person into custody to bring her to a 10am court hearing held person against her will for eighteen hours over two days); *Williams v. Olsen*, 638 F. Supp.3d 204, 222 (N.D.N.Y. 2022)(denying qualified immunity on excessive force claim because under plaintiff's version of events, police officers used deadly force, shooting him twice in the back from 24 feet away while he was unarmed, posed no immediate threat, and was fleeing from an unmarked sedan carrying officers who never identified

16

themselves); *Zarkower v. City of New York*, 461 F. Supp.3d 31, 42 (E.D.N.Y. 2020) (denying qualified immunity where plaintiff alleged that he was arrested, issued a "desk appearance ticket" that authorized his immediate release, and then returned to a cell and held for another five hours for the sole purpose of being questioned by a detective about unrelated crimes committed by other people).

This is nothing like those cases, even when all of Frischling's proposed corrections to the warrant affidavit are taken into account. First, as noted, Section 53-341c is a fifteen-year-old statute that no court has construed in a reported decision and that imposed a novel prohibition that, at least when the statute was enacted, did not exist in many other states. *See* Joint Standing Committee Hearing, 2011, Judiciary, Part 7, at 2101, Testimony of State Victim Advocate (noting that "[o]ne of the barriers in these cases has been that according to the laws of GA, NY, and CA, the [first responders] who took these photographs did not violate any law in their state.") Radford was left to figure out what this unfamiliar statute meant on his own.

Second, Radford's decision to seek an arrest under the statute comports with the statute's apparent purpose of protecting crime or accident victims from exploitation – through the taking or transmitting images of them without their consent at times of personal emergencies or tragedies – by those granted privileged access to them during such times. The statute is titled "Unauthorized taking or transmission by first responders of images of crime or accident victims," and floor statements during the debate preceding the statute's enactment confirm that its purpose was to protect the dignity of crime and accident victims. Conn. General Assembly, House Proceedings, Vol. 54, Part 14, at 4779, Remarks of Rep. Mikutel ("No one should be allowed as a first responder to abuse the privacy and the dignity of a victim. And that's what this is all about…. No one should put a victim on public exhibit."), *id.* at 4784, Remarks of Rep. E. Ritter (citing the "potential for

17

harm to be caused to other individuals and family through the dissemination of these pictures."). Arresting first responders who, without obtaining consent, create images of accident or crime victims and post them on Facebook is consistent with that purpose.

Third, while Frischling argues that Radford ignored or minimized the statute's exception for taking or transmitting images "in the performance of the duties" of the first responder, Radford's apparent interpretation – that "the duties" contemplated could not include taking photographs to be posted on Facebook, regardless of how a local fire or police department might define the jobs of its employees – is not "obvious[ly]" wrong. There is nothing in the legislative debates preceding enactment of the statute suggesting that legislators anticipated that a firefighter or other first responder might be tasked with publicizing an accident or crime scene on Facebook. Under these novel circumstances, Radford could reasonably have rejected an interpretation of "duties" that embraced any responsibilities a local fire, police, ambulance or other emergency agency might assign to one of its employees, a reading that would make the scope of the "duties" exception turn on the decisions of such local agencies, even when those decisions undermined the purpose of the statute; and he could reasonably have adopted one that captured only those duties ordinarily associated with first responders when they are "respond[ing] to a request to provide medical or other assistance to a person," responsibilities that might include taking a photo of an injured person or a dead body for a police report or for the medical examiner. *See* Conn. Gen. Stat. § 53-341c; *see also* Conn. Gen. Stat. § 1-2z (permitting consideration of extra-textual evidence of the meaning of a statute where its "plain meaning" would yield "absurd or unworkable results"); Conn. Gen. Assembly, Senate Proceedings, 2011, Vol. 54, Part 6, at 1927 (Remarks of Sen. Coleman)("There are certain justifications for the taking of photographs, whether it be to provide the photograph to police investigators or to provide the photograph to a coroner or medical

18

examiner.").

The statute's listing of the individuals to whom it applies – "peace officer," "firefighter," "ambulance driver," "emergency medical responder," "emergency medical technician," and "paramedic" – provides some support for Radford's apparent interpretation. None of those job titles connotes a person whose duties include publicizing crime and accident scenes on Facebook, least of all when responding to a request for medical or other assistance. Certainly, the term "firefighter" – which the parties appear to agree covered Frischling – carries no suggestion of such public relations duties. For purposes of the statute, a "firefighter" is defined as "any agent of a municipality *whose duty it is to protect life and property* therein as a member of a duly constituted fire department whether professional or volunteer." Conn. Gen. Stat. § 53a-3(10)(emphasis added). Dictionary definitions of the term "firefighter" likewise focus on the fire-fighting and life-saving duties of the job. Am. Heritage Dictionary of the English Language, 5th Ed. (defining "firefighter" as "[a] member of a fire department who fights fires"); Cambridge Dictionary (defining "firefighter" as "a person whose job it is to stop fires from burning"); Wikipedia ("A firefighter is a first responder trained in public safety and emergency response such as firefighting … respond to emergencies such as hazardous material incidents, medical emergencies, road traffic collisions and other emergencies that threaten life, property and the environment …."). Neither the statutory definition nor the ordinary sense of the word would have conveyed to Radford that Frischling's duties as a firefighter who was responding to a request to provide medical or other assistance would have included taking photos of the victim and posting them on Facebook.

To be sure, Frischling's view of the statute finds some support in Connecticut state court interpretations of the "performance of duties" language in other criminal statutes. "The phrase 'in the performance of his official duties' means that the police officer is simply acting within the

scope of what [he] is employed to do. The test is whether the [police officer] is acting within that compass or is engaging in a personal frolic of his own." *State v. Privitera*, 1 Conn. App. 709, 722 (1984)(internal quotation marks omitted) (construing statute governing interfering with police officer). This language suggests that the employer – here, the Chesterfield Fire Company – defines "the scope" of each first responder's job. Further, as Frischling points out, to the extent that the term "duties" in Section 53-341c is ambiguous, a court would be required to give him the benefit of that ambiguity. *State v. Williams*, 352 Conn. 104, 133 (2025)("Penal laws are generally strictly construed against the State and are not to be read more broadly than their language plainly requires," and under "the rule of lenity," "ambiguities are ordinarily to be resolved in favor of the defendant.").

Radford is not expected to know the rule of lenity or other legal niceties, however, *Reynolds v. City of Anchorage*, 379 F.3d 358, 367 (6th Cir. 2004) (granting qualified immunity in part because police officer was not expected to make "subtle legal distinctions and inferences" necessary for applicable Fourth Amendment analysis), and it was not "obvious" that he was wrong to invoke the statute to arrest a firefighter who took photos, apparently of an accident victim without consent, and posted them on Facebook – even though it fell within his employer-dictated job duties to do so.[5]

As for the photos themselves, the statute is silent as to what constitutes "the image of such a person" and whether, as Frischling appears to suggest, the person for whom medical or other assistance was requested must be identifiable. Here, as noted, the images that were posted were taken at the accident scene and, although pixelated and obscured, can reasonably be construed as

---

[5] To be clear, I express no opinion about whether Frischling's or Radford's view of the statute is correct. My comments about the statute are aimed solely at showing that enforcing it against Frischling was not so clearly out of bounds as to resemble other situations in which courts have found violations of the law so obvious as to dispense with the need for a similar precedent to deny qualified immunity.

depicting an accident victim. Again, Radford is not "obvious[ly]" wrong to treat the posting of such images as a statutory violation, and there is no case where "an officer acting under similar circumstances … was held to have violated the Fourth Amendment." *Wesby,* 583 U.S. at 64. Because it is not clearly established that an arrest under these circumstances violates a plaintiff's constitutional rights, Radford is entitled to summary judgment based on qualified immunity. *See e.g., Dorceant v. Aquino*, No. 15CV7103, 2018 WL 3869891, at *4-5 (E.D.N.Y. Aug. 15, 2018) (finding qualified immunity on false arrest claim where "the law regarding [the state law offense of obstructing governmental administration] as applied to the specific circumstances of this case is unclear"; "[i]t is not clear under New York law whether the combination of physical and verbal interference, as they unfolded in this case, would constitute [obstruction of governmental administration]"); *Flores v. Cnty. of Suffolk*, No. 216CV02502, 2018 WL 3966246, at *8 (E.D.N.Y. Aug. 17, 2018) ("As neither party can identify a case where an officer acting under similar circumstances was held to have acted unconstitutionally, the Court cannot conclude that, based on the information available to the Individual Defendants at the time of the arrest, it was [] clearly established that they lacked probable cause.")(internal quotation marks omitted); *Dale v. Kelley*, 908 F. Supp. 125, 137 (W.D.N.Y. 1995), *aff'd*, 95 F.3d 2 (2d Cir. 1996) (defendant officer entitled to qualified immunity where the law was not clearly established "that the type of testimony presented at the hearing in this case would not support an arrest for perjury").

*Arguable Probable Cause*

Even if a defendant violated clearly established law, he still may be entitled to qualified immunity if his actions were objectively reasonable. A defendant is "entitled to qualified immunity from a suit for damages on a claim for arrest without probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable

21

competence could disagree on whether the probable cause test was met." *Golino*, 950 F.2d at 870. "The Second Circuit has repeatedly referred to that standard as the arguable probable cause standard, and elaborated that arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law." *Haidon*, 2024 WL 3982880, at *12 (internal quotation marks and citations omitted). Under this analysis, the question is "not whether the officer should have acted as he did." *Triolo v. Nassau Cnty.*, 24 F.4th 98, 107–08 (2d Cir. 2022). "Instead, it is whether any reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, could have determined that probable cause existed." *Id.* "Indeed, as the Supreme Court has repeatedly recognized, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks and citation omitted). "Whether a particular officer falls into either of these categories turns on whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Id.* (internal quotation marks and citation omitted).

For the same reasons that preclude finding the law was clearly established with regard to probable cause for Frischling's arrest, I conclude that officers of reasonable competence could disagree whether a corrected affidavit containing all of the information known to Radford established probable cause. *See Brenden v. Castro*, No. 5:23-CV-539, 2025 WL 2771834, at *4 (N.D.N.Y. Sept. 26, 2025) ("Given the unsettled state of the law, officers of reasonable competence could disagree about whether the probable cause test was met…. Accordingly, there is arguable probable cause, [defendant] is entitled to qualified immunity, and the motion for summary judgment is granted on Plaintiff's false arrest claim."). In other words, it is not clear that "no reasonable officer out of the wide range of reasonable people who enforce the laws in this country,

could have determined that probable cause existed" to arrest Frischling for violating Conn. Gen. Stat. § 53-341c.[6] *Triolo*, 24 F.4th at 108.

## IV.    CONCLUSION

For these reasons, Radford's motion for summary judgment (ECF No. 74) as to the § 1983 claims of false arrest (count 1) and malicious prosecution (count 3) is granted, Frischling's motion for partial summary judgment (ECF No. 72) is denied, and Gosselin's motion (ECF No. 71) for summary judgment on the federal failure to intervene claim (count 2), the sole claim remaining against him, is granted.  *See Rolkiewicz v. City of New York*, 442 F. Supp. 3d 627, 646 (S.D.N.Y. 2020) ("[f]ailure to intervene claims are contingent upon the disposition of the primary claims underlying the failure to intervene claim.").  In light of the dismissal of the federal claims, I decline to exercise supplemental jurisdiction over Frischling's state law claims and dismiss those claims without prejudice.  *See* 28 U.S.C. § 1367(c)(3) (district courts may decline to exercise supplemental jurisdiction over a claim if the court has dismissed all claims over which it has original jurisdiction).[7]  Accordingly, the Town of Montville's motion for summary judgment (ECF No. 76) as to count 10, a state law claim, is denied as moot.  *See Sementes v. Quinn*, No. 21-CV-453, 2022 WL 2834607, at *8 (D. Conn. July 20, 2022) (denying as moot motions for summary judgment on state-law claims where the court granted summary judgment on the only federal claim in the case and declined to exercise supplemental jurisdiction over those state-law claims).

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
          July 1, 2026

---

[6] As a result, I need not reach malice, the other contested element of the malicious prosecution claim.

[7] The Court's subject matter jurisdiction is based solely on federal question jurisdiction under 28 U.S.C. § 1331.  See ECF No. 38 ¶4.